**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

v.

KOREN KECHEDZIAN, AKA Khoren
Kechedzian, AKA Robert
Kechedzian,
    *Defendant-Appellant.*

No. 16-50326

D.C. No.
2:14-cr-00147-
PSG-1

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted July 10, 2018
Pasadena, California

Filed September 4, 2018

Before:  D. Michael Fisher,[*] Paul J. Watford,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Fisher

---

[*] The Honorable D. Michael Fisher, United States Circuit Judge for
the U.S. Court of Appeals for the Third Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

Reversing a criminal judgment imposed following a jury conviction for possession of unauthorized access devices and aggravated identity theft, the panel held that the district court erred by failing to excuse a juror for cause under an actual bias theory.

The panel wrote that it can have no confidence that a juror would lay aside her biases or prejudicial personal experiences and render a fair and impartial verdict, where, as here, the juror was unable to state that she would serve fairly and impartially despite being asked repeatedly for such assurances.

## COUNSEL

Jennifer Leigh Williams (argued), Anya Jennifer Goldstein (argued), and Reuven L. Cohen, Cohen Williams Williams LLP, Los Angeles, California, for Defendant-Appellant.

Scott Paetty (argued) and Kerry L. Quinn, Assistant United States Attorneys; Lawrence S. Middleton, Chief, Criminal Division; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

FISHER, Circuit Judge:

Koren Kechedzian appeals from his conviction and sentence imposed for two counts of possession of 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029, and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A. On appeal, Kechedzian contends that the district court erred by: (1) refusing to dismiss a prospective juror for bias where the juror never unequivocally stated she could be fair and impartial; (2) allowing certain expert testimony; (3) allowing a prosecutor to improperly cross-examine him; (4) failing to adequately rule on his objections to the presentence report; and (5) imposing restitution. Although issues two through four are troubling, we will not reach them because we reverse on the basis of the first issue, concluding that the challenged juror should have been excused for cause under an actual bias theory.

## I. Factual and procedural background

After receiving a tip that Kechedzian was linked to a fugitive operating a large credit card fraud ring, federal agents conducted a trash pull from Kechedzian's residence. In his trash, they found two counterfeit credit cards and, based on this, the agents obtained a search warrant. The resulting search of Kechedzian's residence and cars uncovered two USB drives containing 1,451 stolen credit card numbers in text files, a Bluetooth-enabled "skimming device" commonly used to steal credit card information from gas station pumps, and several cards with stolen data re-encoded on the magnetic strips. Bank records revealed that many of the stolen card numbers had been used fraudulently

at gas stations and other retail establishments across the United States.

A grand jury returned a four-count indictment, charging Kechedzian with two counts of possession of 15 or more unauthorized access devices,[1] in violation of 18 U.S.C. § 1029, and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A. The case proceeded to trial.

At the beginning of jury selection, the district court read a general statement of the case, laying out the charges against Kechedzian. It then asked: "[D]oes anyone feel, just based on the charges in this case, based on what this case is about, that they could not be fair and impartial to both sides? Does anyone feel that way at this point in time?"

Juror # 3 (Juror Rose) raised her hand and had the following colloquy with the court:

| JUROR # 3: | Yes. . . . [A]bout five years ago I had . . . my social security number [stolen.] . . . I might be able to put that aside and just go by what I hear here in the courtroom. |
|---|---|
| THE COURT: | "Might" is a significant word. Let's follow up with it a little bit. Obviously |

---

[1] An "unauthorized access device" in this context means any "card" or "account number" that is "lost, stolen, expired, revoked, canceled, or obtained with intent to defraud," which can be used "to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds." 18 U.S.C. § 1029(e)(1), (3).

you couldn't be a juror on the person who stole your identity and social security card. You'd be a bit upset—

JUROR # 3: Absolutely not.

THE COURT: You would be quite upset about that. But I guess the question becomes not just maybe. We need to know whether or not you are going to decide this case based on what happened to you and your social security number. What do you think?

JUROR # 3: Well, I would want to put my personal stuff aside, but I honestly don't know if I could.

THE COURT: So will you tell us if you can't, if all of a sudden you go through this case and you say you know what? My social security number is popping up in my head, and I'm going to decide this case based on what happened to me? Would you tell us that?

> JUROR # 3:       No, I would try to be fair
>                  . . . and put my personal
>                  experience aside.
>
> THE COURT:       But if it turns out you're
>                  going through this process
>                  and you feel you can't—
>                  it's not working, would
>                  you tell us?
>
> JUROR # 3:       Yes, I would.
>
> THE COURT:       Okay. All right.

Shortly after this interaction with Juror # 3, the court asked all jurors the following question:

> The first principle, as Mr. Kechedzian sits there at counsel table, he is presumed to be innocent. Second, the defense doesn't have to prove anything in this case, does not have to present any evidence. Next, the government has the burden of proof in this case, and that is to prove its case beyond a reasonable doubt. Does everybody understand those principles and could follow those principles? Raise your hand if you at this point are of the mindset that you could not follow those principles.

Juror # 3 did not respond.

Later, at sidebar, defense counsel sought to have Juror # 3 excused for cause, stating: "I'm concerned that No. 3 did not answer your question . . . about whether she could . . .

put . . . this social security theft five years ago out of her mind. She said she might be able to. I don't think that's sufficient. So I would challenge [her]." The district court denied the motion, stating "I think at the end of the day she confirmed or committed to the principles of the presumption of innocence and burden of proof. I would deny [the motion] as to 3." Juror # 3 sat on Kechedzian's jury.

The jury ultimately returned a guilty verdict, and Kechedzian was sentenced to 65 months in prison followed by three years of supervised release. The district court also ordered $114,134.76 in restitution. Kechedzian timely appealed, arguing that he is entitled to a new trial or, in the alternative, that he is entitled to a new sentencing hearing.

## II. Jurisdiction and Standard of Review

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291. Kechedzian contends that Juror # 3 should have been disqualified because of both actual bias and implied bias. Rulings on actual bias are reviewed for manifest error or abuse of discretion, because the determination of impartiality may be based on the district court's evaluation of a prospective juror's demeanor. *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000). A district court abuses its discretion when its bases a decision "on an erroneous legal standard or a clearly erroneous finding of fact." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). In contrast, we review rulings on implied bias de novo, because they present mixed questions of law and fact. *Gonzalez*, 214 F.3d at 1112.

### III. Analysis

"The Sixth Amendment guarantees criminal defendants a verdict by an impartial jury," and "[t]he bias or prejudice of even a single juror is enough to violate that guarantee." *Id.* at 1111. "Accordingly, '[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.'" *Id.* (quoting *Dyer v. Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998) (en banc)). And any "[d]oubts regarding bias must be resolved against the juror." *Id.* at 1114 (quoting *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991)). "One important mechanism for ensuring impartiality is voir dire, which enables the parties to probe potential jurors for prejudice." *Dyer*, 151 F.3d at 973. After voir dire, counsel may challenge a prospective juror for cause, and a partial or biased juror should be removed if there is a showing of either implied or actual bias. *Gonzalez*, 214 F.3d at 1111. Here, Kechedzian alleges bias under both theories.

Actual bias is the "more common ground for excusing jurors for cause." *Id.* at 1112. Also referred to as "bias in fact," actual bias is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* (quoting *United States v. Torres*, 128 F.3d 38, 43 (2nd Cir. 1997)); *see Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1220 (9th Cir. 1997) ("Actual bias involves an inability to act impartially or a refusal to weigh the evidence properly."). Actual bias can be revealed through a juror's express answers during voir dire, but it can also be revealed by circumstantial evidence during questioning. *Gonzalez*, 214 F.3d at 1111–12. It is within a trial judge's discretion to disregard a prospective juror's initial responses suggesting bias if that juror later "commits to lay aside those feelings and reach a verdict based on the

evidence presented and the court's instructions." *Image Tech.*, 125 F.3d at 1220.

In contrast, implied bias is presumed only in "extraordinary cases." *Dyer*, 151 F.3d at 981. In analyzing implied bias, we look to "whether an average person in the position of the juror in controversy would be prejudiced." *Gonzalez*, 214 F.3d at 1112 (quoting *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1260–61 (10th Cir. 1999)). This Court has found "implied bias in those extreme situations 'where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances,'" *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007) (en banc) (quoting *Gonzalez*, 214 F.3d at 1112), "or where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury," *id.* (quoting *Dyer*, 151 F.3d at 982). The implied bias inquiry is an objective one; thus, even if a juror states or believes that she can be impartial, the court may find implied bias based on the circumstances. *Id.*

Despite the differences between actual bias and implied bias, courts sometimes analyze these theories together when both are implicated. *See, e.g.*, *Gonzalez*, 214 F.3d at 1113–14 (reversing for actual or implied bias after analyzing both theories together). Here, however, we find it instructive to analyze the theories separately.

At the outset, we note that although Juror # 3 was previously a victim of identity theft, this is not the type of "extreme" situation where we find implied bias. *See, e.g.*, *Dyer*, 151 F.3d at 981–82 (reversing murder conviction for implied bias where prospective juror concealed the murder of her brother during voir dire); *see also United States v.*

*Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) (finding implied bias where juror sat on a heroin distribution case yet failed to disclose that his sons were serving prison terms for heroin-related crimes); *United States v. Allsup*, 566 F.2d 68, 71–72 (9th Cir. 1977) (reversing for implied bias where two prospective jurors worked for the bank the defendant allegedly robbed, even though they stated that they could decide the case fairly). In other words, the mere fact that Juror # 3 was previously an identity theft victim—without more—does not make it "highly unlikely that [she] . . . could remain impartial in [her] deliberations.'" *Fields*, 503 F.3d at 773 (quoting *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990)). Nor is there any evidence of Juror # 3 lying during voir dire. Quite the opposite: she fully disclosed that she had previously been a victim of identity theft and expressed concern about her ability to remain impartial. Thus, we focus our analysis on the actual bias inquiry.

For his actual bias argument, Kechedzian primarily relies on *Gonzalez*, whereas the Government primarily relies on *United States v. Alexander*, 48 F.3d 1477 (9th Cir. 1995). Although this case is more like *Gonzalez*, neither case is directly on point.

In *Gonzalez*, this Court held that the district court's failure to excuse a challenged juror for cause required reversal. Gonzalez was accused of, *inter alia*, cocaine distribution. *Gonzalez*, 214 F.3d at 1110. During jury selection, one prospective juror, Juror Camacho, notified the court that her ex-husband, with whom she had a daughter, had "both used and dealt cocaine during their marriage." *Id.* Moreover, Juror Camacho testified that her husband's involvement in drug trafficking had been a "painful" experience that was "one of the reasons" for their eventual divorce. *Id.* at 1110–11.

The district judge, seemingly concerned by these answers, asked Juror Camacho "*three* times whether she could be fair, and each time she responded equivocally. Not *once* did she affirmatively state that she could or would serve fairly or impartially." *Id.* at 1114. She also "displayed some discomfort during the questioning." *Id.* Gonzalez's counsel sought to strike Camacho for cause, citing Camacho's three equivocal responses, the fact that her husband had been involved in cocaine use and distribution, and Camacho's negative body language. *Id.* at 1111. The district court denied the motion, finding that Juror Camacho's responses were "not enough to excuse her." *Id.* Camacho sat on Gonzalez's jury, and Gonzalez was ultimately found guilty.

On appeal, this Court concluded that Juror Camacho should have been excused, explaining that:

> When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will "lay aside" her biases or her prejudicial personal experiences and render a fair and impartial verdict. Given Camacho's responses to the court's questions and the similarity between her traumatic familial experience and the defendant's alleged conduct, we conclude that the failure to excuse her for cause under either an express or implied bias theory requires reversal.

*Id.* at 1114.

Contrastingly, in *United States v. Alexander*, this Court held that the district court properly declined to excuse two jurors. There, the defendant was on trial for, *inter alia*, armed

bank robbery and use of a firearm during the commission of a crime of violence. *Alexander*, 48 F.3d at 1481. At issue were the responses of two prospective jurors—Juror Austin and Juror Kenny. *Id.* at 1482–83 nn.1–2.

Juror Austin, who had previously been held up at gunpoint, initially noted that he "believe[d]" he could remain fair and impartial, but he later affirmatively stated that he could. *Id.* at 1482 n.1. This Court determined that the district court "was not required to excuse" Juror Austin based on his initial response, because he "ultimately stated definitively that he could separate his experience from the facts of the case and act fairly." *Id.* at 1484.

Juror Kenny posed a "closer question." *Id.* Her husband had been held up at gunpoint four years earlier. *Id.* at 1483 n.2. When the district judge asked Juror Kenny if her previous experience would affect her "ability to be fair and impartial," she answered: "I don't believe so, no." *Id.* Asked later if she could "set aside those feelings, and act impartially and fairly to both sides of the case," she answered, "I believe so, yes." *Id.* This Court ultimately deferred to the district court's determination, in light of Juror Kenny's demeanor and credibility, that "when Kenny said she 'believed' she could act impartially, this was equivalent to saying she would do so." *Id.* at 1484.

As an initial matter, we reject the Government's contention that Juror # 3's answers are comparable to Juror Austin's answers in *Alexander*. Unlike Juror Austin, Juror # 3 never affirmatively stated that she could be impartial. In fact, Juror # 3 was asked three times—the same number of times as Juror Camacho in *Gonzalez*—if she could be impartial. And each time, she replied equivocally: (1) "I might be able to put that aside"; (2) "I would want to put my personal stuff aside, but I honestly don't know if I could";

and (3) "I would try to be fair." Likewise, we reject any argument that Juror # 3's final response—"I would try to be fair"—is an unequivocal statement of impartiality. As we noted in *Gonzalez*, a response of "I'll try" is not an unequivocal statement. *Gonzalez*, 214 F.3d at 1113 n.5 ("Despite the government's best efforts to characterize the response 'I'll try' as unequivocal, we cannot agree . . . . If a parent asks a teenager whether he will be back before curfew, that parent is highly unlikely to find 'I'll try' an adequate, satisfactory, or unequivocal response.").

The Government next suggests that Juror # 3 is more akin to Juror Kenny in *Alexander* than Juror Camacho in *Gonzalez*, because the colloquy here resembles the "curative" questioning of Juror Kenny. Not so. Juror Kenny was ultimately asked if she could "set aside [her] feelings, and act impartially and fairly to both sides of the case." *Alexander*, 49 F.3d at 1483 n.2. She responded: "I believe so, yes." *Id.* That statement—"I believe so, yes"—appears somewhat equivocal, but we deferred to the district court's determination that, based on Juror Kenny's demeanor and its assessment of her credibility, "when Kenny said she 'believed' she could act impartially, this was equivalent to saying she would do so." *Id.* at 1484.**[2]** We cannot do the same here because none of Juror #3's equivocal statements could be understood as affirmative statements of impartiality. In fact, not only were all of Juror # 3's responses equivocal, but she explicitly noted that she was unsure if she could put her personal biases aside.

---

**[2]** Indeed, Juror Kenny's "I believe" response is a more modest, but no less unequivocal way of expressing an idea. Jurors are human, so we do not demand that they pledge impartiality with complete certainty.

As previously noted, we find this case to be more like *Gonzalez* than *Alexander*. For example, like Juror Camacho in *Gonzalez*, Juror # 3 was asked three times if she could remain impartial. And like Juror Camacho, Juror # 3 responded equivocally each time. The Government nonetheless attempts to distinguish *Gonzalez* by highlighting two differences. For the following reasons, we conclude that these differences do not compel a different result than the one we reached in *Gonzalez*.

First, the Government notes the following exchange between the district judge and Juror # 3:

> COURT:       But if it turns out you're going through this process and you feel you can't—it's not working, would you tell us?
>
> JUROR # 3:   Yes, I would.
>
> COURT:       Okay. All right.

The Government suggests that this answer—"Yes, I would"—was an "unqualified affirmative" statement of impartiality. *See Gonzalez*, 214 F.3d at 1114 (noting that a juror's ultimate "answer with an unqualified affirmative or negative" is "appropriate for purposes of indicating . . . ability to serve impartially"). We disagree. The question that Juror # 3 was answering was if she would let the district judge know (after the trial began) if "it's not working"; she was not affirming that she would be impartial. This is especially important when viewed in context. Here, when asked if she could be fair and impartial, Juror # 3 not only

repeatedly answered equivocally, but she explicitly expressed doubt that she could.

Moreover, there was nothing particularly curative about this arrangement (in which Juror # 3 was to tell the judge later if she felt biased). Juror # 3 noted she would let the court know if she was feeling that "it" was "not working." What this exactly means—and when and how she would communicate this to the judge—is largely unclear. And this arrangement provided no assurance that Juror # 3 would—or could—actually put aside her prejudices, let alone speak up once trial began. That the Government does not cite any authority to support this type of arrangement is unsurprising; putting the onus on a juror to speak up, after a trial starts, undermines the very purpose of voir dire and its indispensable role in preserving for the accused an impartial jury. Indeed, part of the reason voir dire is conducted before the presentation of evidence is to isolate a prospective juror's biases from what they hear at trial. Especially given the investment jurors feel in their role and their commitment to seeing the process through, it seems unrealistic to expect that a juror could fairly make constant assessments of whether her feelings towards the accused were the justifiable consequence of the evidence presented so far or due to her earlier life experiences. Ultimately, voir dire is one of the "important mechanism[s] for ensuring impartiality," *Dyer*, 151 F.3d at 973; this type of arrangement is an unacceptable substitute.[3]

---

[3] We note that there is nothing inherently wrong with an arrangement involving a judge's checking in with a juror. For example, if a juror initially responds equivocally, but ultimately responds unequivocally, a district judge may want to employ such an arrangement to ensure impartiality throughout the trial (though a district judge is, of

A second difference noted by the Government is that, here, the district judge asked the entire venire if they could follow the principles of presumption of innocence and burden of proof. No prospective juror—including Juror # 3—responded by saying they could not. According to the Government, Juror # 3's failure to respond to this question suggests that she was committed to deciding the case impartially. Again, we disagree. That Juror # 3 failed to speak up does not indicate that she could be impartial, nor did this interaction amount to a curative instruction. Presumption of innocence and the burden of proof are distinct legal principles from impartiality. A juror can understand the presumption of innocence and burden of proof, yet still let personal prejudice infect her ability to be impartial. In sum, although there are some factual differences between this case and *Gonzalez*, none are of consequence because, at bottom, Juror # 3's statements do not provide any assurance that she was, or could have been, impartial.

## IV. Conclusion

"Few aspects of a jury trial are more committed to a district court's discretion than the decision whether to excuse a prospective juror for actual bias." *United States v. Miguel*, 111 F.3d 666, 673 (9th Cir. 1997) (quoting *United States v. Claiborne*, 765 F.2d 784, 800 (9th Cir. 1985), *abrogated on other grounds by Ross v. Oklahoma*, 487 U.S. 81 (1988)). But as we noted in *Gonzalez*, "[w]hen a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no

course, not required to do so). Such an arrangement, however, is insufficient where—as here—a juror repeatedly responds equivocally during voir dire.

confidence that the juror will 'lay aside' her biases or her prejudicial personal experiences and render a fair and impartial verdict." *Gonzalez*, 214 F.3d at 1114. Because this is precisely what occurred here, the district court was obligated to excuse Juror # 3 for cause under an actual bias theory. Accordingly, we **REVERSE** and **REMAND** for a new trial.